## QUESTION 13 ATTACHMENT

## COMPLIANCE WITH BR 9011 AND DECLARATION THAT PETITION IS NOT FILED IN BAD FAITH

1. Before filing this Petition I contacted the Debtor Perigrove 1018 and was unable to resolve the matter, thereby resulting in this involuntary filing. I declare under the penalty of perjury that the amount in controversy exceeds$18,000. I also declare that had the Debtor   provided me the information I requested this petition would not be filed. This petition is not filed in bad faith, nor for any improper purpose.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 1 OF 88

## TABLE SHOWING WHO PERIGROVE 1018 IS



**QUESTION 13 ATTACHMENT CONTINUED PAGE 2 OF 88**

# THE FLACKS GROUP

```
                    ┌──────────────────────┐
                    │  The Flacks Group    │
                    ├──────────────────────┤
                    │   M2 HoldCo, LLC     │
                    └──────────────────────┘
           ┌──────────────────┴──────────────────┐
   ┌───────────────────┐              ┌───────────────────────┐
   │  M2 LoanCo, LLC   │              │  M2 EquityCo, LLC     │
   └───────────────────┘              └───────────────────────┘
```

| Valitás Intermediate Holdings, Inc. (50.1% Membership in Pharmacorr/M2, LLC) | M2 Pharmacorr Equity Holdings, LLC (49.1% Membership in Pharmacorr/M2, LLC) |
|---|---|

| Valitás Health Services, Inc. | Pharmacorr/M2, LLC |
|---|---|

| Corizon Health, Inc. | Pharmacorr Holdings, LLC |
|---|---|

| Corizon, LLC | Corizon Health of New Jersey, LLC | Pharmacorr, LLC | Endeavor Distribution, LLC |
|---|---|---|---|

**QUESTION 13 ATTACHMENT CONTINUED PAGE 3 OF 88**

# THE PERSONS WHO CALL THE SHOTS AND AIDED IN THE FRAUDULENT ACTIVITIES



## TABLE OF CONTENTS

Compliance With BR 9011 And Declaration That Petition Is Not Filed In Bad Faith 1

Table Showing Who Perigrove 1018 Is ..................................................... 2

The Flacks Group ............................................................................. 3

## QUESTION 13 ATTACHMENT CONTINUED PAGE 4 OF 88

The Persons Who Call The Shots And Aided In The Fraudulent Activities............... 4

The Debtor Perigrove 1018 And Those Acting In Concert With It Pulled The Biggest Scam In This Court To Defraud Me And 300,000 Other Prisoners. The Claims That I And All Victims Have .............................................................. 6

The Debtor Should Be Ordered To Give Notice To The 300,000 Victims ............... 7

The Total Damages ............................................................... 8

The Corporate Veil Should Be Pierced..................................................... 8

To Prevent Injustice Or Inequity Or The Like, The Corporate Veil Should Be Pierced As The Debtor Abused The Limited Liability Privilege ............................................ 8

(A)   Questionable Dealings, Therefore, Must Be Examined To Determine If The Limited Liability Privilege Conferred On The Debtor Entity Has Been Abused By Those In Control............................................. 8

Symbolic Terms, Appropriate Targets, And General Tests ................................... 10

(B)   Guiding Factors ................................................................. 11

(C)   Factors Analysis ............................................................... 14

Inability To Pay.................................................................... 16

How The Scheme To Fraud Designed By Perigrove 1018 Worked........................ 16

Some Specific Acts Committed By Corizon........................................... 18

Perigrove 1018 Placed Mr. Lefkowitz In Charge To Ensure Success Of Its Scheme 22

Executive Terminated For Questioning Misapplication Of Funds.......................... 23

Perigrove 1018, Its Directors And Related Parties   Transfer Millions.................. 23

Perigrove 1018, Its Directors And Related Parties   Open Bank Accounts In Name Of Corizon But Corizon Employees Had No Access To These Accounts ................ 23

Perigrove 1018 Was Responsible For Moving Monies........................................ 24

Perigrove Used Conduits To Transfer Monies ....................................... 24

Corizon Funds Are Used To Benefit Pharmacorr. ................................... 24

Transfers To M2 Loanco........................................................... 25

## QUESTION 13 ATTACHMENT CONTINUED PAGE 5 OF 88

Transfers To Geneva Consulting.............................................................. 25

Transfers To Amerisource Bergen To Benefit Pharmacorr And Perigrove 1018 Related Parties.................................................................................... 27

Accrual And The Injury I Sustained From The Criminal Enterprise Operated By Corizon As Set Forth Below ................................................................. 27

What The Former Medical Director Of Corizon,   Has Testified To ...................... 28

The Prisoner Victims ............................................................................ 30

The Conspiracy To Engage In Spoliation And Then Prevent The Claims From Being Heard.............................................................................................. 75

The Pattern Of Racketeering Activity ....................................................... 77

First Claim For Relief .......................................................................... 80

Second Claim For Relief ....................................................................... 83

Third Claim For Relief.......................................................................... 86

## THE DEBTOR PERIGROVE 1018 AND THOSE ACTING IN CONCERT WITH IT PULLED THE BIGGEST SCAM IN THIS COURT TO DEFRAUD ME AND 300,000 OTHER PRISONERS. THE CLAIMS THAT I AND ALL VICTIMS HAVE

1. The Debtor Perigrove 1018   deprived me and other prisoners of monies due us by laundering monies and engaging in transactions set forth herein.
2. The foregoing is a table showing the Debtor Perigrove 1018 and its affiliates   engaged in   avoidance, unjust enrichment,

## QUESTION 13 ATTACHMENT CONTINUED PAGE 6 OF 88

spoliation, fraudulent concealment, fraud, avoidance, deceit, common law   constructive fraud, constructive taking,   breach of fiduciary duty, deceptive business practices, fraud upon the court, and conspiracy to engage in these torts.  Their conduct also is a violation of my right of access to courts, as they, by filing this bankruptcy, prevented the United States Supreme Court, Third, Ninth and Arizona federal courts from reviewing my claims on spoliation. I and the 300,000 others would have prevailed had they not filed this bankruptcy, and allowed the courts, to review my claims. committed Mail Fraud 18 USC § 1341, wire fraud 18 USC 1343,   Concealment of assets 18 USC § 152(1), false oaths 18 USC § 152(2), false declarations or false statements under penalty of perjury 18 USC § 152(3), embezzlement form the estate of the Corizon 18SC § 15, money laundering 18 USC § 1956, fraudulent schemes ARS §13-2310; forgery ARS § 13-2003 Concealment of assets 18 USC § 152(1), false oaths 18 USC § 152(2), false declarations or false statements under penalty of perjury 18 USC § 152(3), embezzlement form the estate of the Debtor Perigrove 1018 18SC § 15, money laundering 18 USC § 1956 are predicate acts cognizable as racketeering unlawful activity under RICO 18 USC § 1961(1)(A)(B)(D) and ARS § 2301.D.4(b)(iv)Iv)(xx)(xv) that make this scheme.

## THE DEBTOR SHOULD BE ORDERED TO GIVE NOTICE TO THE 300,000 VICTIMS

3. The 300,000 victims are current and former prisoners, in litigation against or with claims against, a subsidiary of Debtor, Corizon. Their identities are known to the Debtor. Some of these 300,000 victims are discussed in this petition. The Debtor should be ordered to provide notice to these victims whose address it has.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 7 OF 88

## THE TOTAL DAMAGES

4. The total damages are $30,000,000,000 for the 300,000 victims at $100,000 per victim plus treble damages.

## THE CORPORATE VEIL SHOULD BE PIERCED

5. The corporate structure is a mere instrumentality for bankruptcy fraud by Isaac Lefkowitz, Sara Ann Tirschwell, Ayodeji Ladele, Beverly Rice, Jeffrey King, Frank Sholey, James Gassenheimer, Charles Gassenheimer, James Hyman, Michael Flacks, the Debtor and its subsidiaries.

## TO PREVENT INJUSTICE OR INEQUITY OR THE LIKE, THE CORPORATE VEIL SHOULD BE PIERCED AS THE DEBTOR ABUSED THE LIMITED LIABILITY PRIVILEGE

### (A) QUESTIONABLE DEALINGS, THEREFORE, MUST BE EXAMINED TO DETERMINE IF THE LIMITED LIABILITY PRIVILEGE CONFERRED ON THE DEBTOR ENTITY HAS BEEN ABUSED BY THOSE IN CONTROL.

6. Harvey Gelb, Personal Corporate Liability, A Guide for Planners, Litigators and Creditors' Counsel (1991), includes a lengthy first chapter on veil piercing containing considerable analysis on the subject, as well as several articles dealing with piercing.

7. The limited liability privilege is granted to owners of certain enterprises, such as corporations or limited liability companies, to encourage investment. "The common purpose of statutes providing limited shareholder liability is to offer a valuable incentive to business investment." Thus, in general, a person can transfer assets to and become an owner of a

## QUESTION 13 ATTACHMENT CONTINUED PAGE 8 OF 88

limited liability entity without losing assets uncommitted to the venture. Persons are encouraged thereby to take risks, but on a limited basis. This privilege should appeal to passive investors who are willing to place at least some of their assets into enterprises controlled by others. But it should also be attractive to investors who participate in the control of an enterprise.

8. While much good may come from the existence of the limited liability privilege, it may be abused, and when that happens courts have shown a readiness, however reluctant, to counter the abuse. To take an extreme example, suppose a person who organizes and operates a limited liability entity neither provides, nor allows it to retain, any assets available for the payment of creditors, and permits it to purchase no insurance. Suppose further that a customer is seriously injured because of the entity's negligent high-risk operations, and that the customer obtains an uncollectible judgment of $50,000 against the entity for her injury. Is justice served by passing this loss to the victim, and indirectly to others to whom she is indebted because of her injury, or even to the society at large that charitably helps her meet needs traceable to it? Or, suppose the same entity purchased inventory for which it has not paid and the seller has not agreed to look only to the entity for payment. Is justice served by allowing its owner-operator to hide behind the veil of limited liability? In either case—is the public policy of stimulating investment, which underlies the limited liability privilege, being served?

9. Carried to absurd lengths, would the limited liability privilege allow pseudo-investors to accomplish through fraud or other wrongful conduct the transfer or retention of wealth for their own benefit at the expense of their creditors?

10. To counter abuse of the limited liability privilege, many courts have used veil piercing doctrines in recognition of the fact that, in some situations, blind acceptance of the privilege will permit the triumph of injustice, inequity, fraud, or the like

**QUESTION 13 ATTACHMENT CONTINUED PAGE 9 OF 88**

of a serious enough nature to warrant piercing. Labadie Coal
Co. v. Black, 672 F.2d 92, 96 (D.C. Cir. 1982).

## SYMBOLIC TERMS, APPROPRIATE TARGETS, AND GENERAL TESTS

11.     Veil piercing cases sometimes contain colorful or symbolic
terms such as "sham," "instrumentality," "alter ego," or
"dummy" to reflect characteristics of entities whose veils are
to be disregarded.  While the terms are themselves conclusory
in nature and generally of little analytical use, they form part
of the vocabulary used in particular jurisdictions and their use
must be understood in various contexts, say, for example, by
an appellate advocate who responds to a judge asking her to
present her alter ego argument.

12.     In cases where creditors—whose underlying claims stem
from the tort or contract liability of the entity—seek to pierce
its veil, the proper targets are generally those who by virtue of
their control are responsible for the conduct triggering the
piercing decision. Ronald J. Colombo, Law of Corporate
Officers and Directors: Rights, Duties and Liabilities § 20:13
(2017).

13.     Two of the guiding tests, neither of which is written in
language entirely understandable on its face and either of
which appears with some frequency, though by no means
universally, in cases involving piercing claims, may be set
forth substantially in the forms that follow.

14.     Test 1 may be referred to as the "unity of interest and
ownership test," and it states that to pierce the corporate veil,
the plaintiff must show that: (1) [T]here is such a unity of
interest and ownership that the separate personalities of the
corporation and the parties who compose it no longer exist, and
(2) circumstances are such that adherence to the fiction of a
separate corporation would promote injustice or inequitable
circumstances Steiner Elec. Co. v. Maniscalco, 51 N.E.3d 45,
46, 56 (Ill. App. Ct. 2016). For a similar example of this test,

## QUESTION 13 ATTACHMENT CONTINUED PAGE 10 OF 88

see Semmaterials, L.P. v. Alliance Asphalt, Inc., 2008 WL 161797, at *4 (D. Idaho Jan. 15, 2008).

15.     Test 2 may be referred to as the "instrumentality test" and may be stated largely as follows: The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. Batoh v. McNeil-PPC, Inc., 167 F. Supp. 3d 296, 323 (D. Conn. 2016). For a similar statement of this test, see John Knox Village v. Fortis Const. Co., LLC, 449 S.W.3d 68, 76 (Mo. Ct. App. 2014).

### (B)    GUIDING FACTORS

16.     In addition, courts often set forth lists of factors as guidance in piercing decisions. Continental Cas. Co. v. Symons, 817 F.3d 979, 993–94 (7th Cir. 2016), cert. denied, 137 S. Ct. 493 (2016). Harvey Gelb, Limited Liability Policy and Veil Piercing, 9 WYO. L. REV. 551, 556–58 (2009) [hereinafter Gelb, Limited Liability Policy]. The lists do not purport to be exclusive, may be of varying sizes and content, and are rather loosely applied as guidelines without any requirement that all or any particular factors be present to justify piercing.

17.     It is important too, as reflected in the second prong of Test 1 or with more detail in the second prong of Test 2, that piercing in favor of creditors is used to prevent injustice or

**QUESTION 13 ATTACHMENT CONTINUED PAGE 11 OF 88**

inequity or the like of sufficient gravity to overcome the normally expected judicial reluctance to pierce.

18.     Continental v. Symons provides a good vehicle for reviewing several aspects of mainstream veil piercing law for purposes of this Article. First, it contains a list of guiding factors (referred to as the "Aronson factors") under Indiana's veil piercing law, factors which to a considerable degree appear in veil piercing analyses under the law of other states. Second, it provides a good basis for the discussion of some of the important issues which may arise in veil piercing cases. Third, like Husky, Continental is a contract creditor pursuing a veil piercing claim.

19.     In 1998, IGF Insurance Company (IGF) purchased a crop insurance business from Continental.  In 2002, while still indebted to Continental for more than $25 million in connection with that purchase, IGF resold the crop insurance business for more than $40 million. But the Symons Group (Gordon, Alan, and Douglas) that controlled IGF structured the sale so that most of the proceeds were siphoned into other companies the group controlled as follows: $9 million to Symons International Group Inc. and Goran Capital Inc. (which were IGF parent companies) in exchange for non-compete agreements and $15 million to Granite Reinsurance Co. in exchange for a reinsurance treaty.  Only $16.5 million of the purchase price went to IGF. Continental sued for breach of contract and fraudulent transfer.

20.     District court findings that the non-compete and reinsurance agreements constituted fraudulent diversions of the purchase money for the crop insurance business were upheld by the circuit court, but the court expressly avoided deciding if Alan and Gordon's estate (which was substituted for Gordon after his death) were liable as transferees under the Uniform Fraudulent Transfer Act.

21.     Although the appeal focused on several questions for review, the discussion here is mainly limited to the bases for

**QUESTION 13 ATTACHMENT CONTINUED PAGE 12 OF 88**

the court finding Alan Symons and the Estate of Gordon Symons subject to "veil piercing" liability (at times characterized by the court as "alter ego" liability).

22.    In dealing with veil piercing liability under the pertinent Indiana law, the Seventh Circuit noted that "Indiana courts hesitate to pierce the corporate veil [but they] will do so to prevent fraud or injustice to a third party." The court stated that the alter ego analysis in Indiana proceeds along the so-called "Aronson factors" which include: (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

23.    A look at the above Aronson factors and similar ones, the like of which appear in many veil piercing cases, would indicate that evidence regarding these factors may well be probative of financial irresponsibility or misbehavior, information on who was in control of the limited liability entity, and whether the defendant had wronged the plaintiff in a way serious enough to justify veil piercing. And while piercing terminology and factors are not completely uniform across the United States, Continental, in its use of the Aronson factors, offers a good example of a mainstream judicial approach.

24.    The Seventh Circuit pointed to some additional factors (the "Smith factors") used where a court is asked to decide if two or more affiliated corporations should be treated as a single entity, a question which also came up in Continental: "whether similar corporate names were used; whether there were common principal corporate officers, directors, and employees; whether the business purposes of the corporations

**QUESTION 13 ATTACHMENT CONTINUED PAGE 13 OF 88**

were similar; and whether the corporations were located in the same offices and used the same telephone numbers and business cards."

### (C)   FACTORS ANALYSIS

25.     Before considering the court of appeals' analysis and application of veil piercing factors in reviewing the district court decision to hold Alan and Gordon personally liable, it may be useful to bear in mind two points. First, there is the direct or indirect control of Symons family members over a host of entities, which the court even referred to as a corporate empire.     Significantly, the court of appeals approved the district court's findings that "'Alan, Doug, and Gordon Symons ignored, controlled, and manipulated the corporate forms' of IGF, IGF Holdings, Symons International, Granite Re, Superior, Pafco, and Goran, and 'operated the corporations as a single business enterprise such that these entities were mere instrumentalities of the Symons family.'"

26.     Second, the existence of controlled entities not only opens the door for possible questionable dealings between or among controlling parties and the entities, but also between or among the entities, dealings that could render a limited liability entity debtor unable to meet obligations.

27.     Questionable dealings, therefore, must be examined to determine if the limited liability privilege conferred on the debtor entity has been abused by those in control. Examples of examinations involving controlled entity dealings appear in connection with circuit court references to commingling.  In sustaining the district court's alter ego findings as not clearly wrong, the Seventh Circuit Court of Appeals approved the trial judge's use of factors identified in Aronson and Smith in determining if Alan and Gordon used their control over their corporate empire to enrich themselves at the expense of Continental.  In doing so, the court rejected defendants' claim that use of factors from both cases involved an improper

**QUESTION 13 ATTACHMENT CONTINUED PAGE 14 OF 88**

blending, stating that the Aronson factors are not necessarily exhaustive, and thus the court demonstrated an unsurprising flexibility in the utilization of factors in a piercing case. The court referred to the lower court's evaluations regarding undercapitalization, fraudulent representation by corporation shareholders or directors, corporate formalities, commingling assets, and common address as the basis for the lower court conclusion "that the Symonses used their control over the Goran-related companies to fraudulently avoid satisfying the debt to Continental."

28.   Regarding undercapitalization, the appellate court pointed to the lower court's evaluation as follows: The judge did not find the companies undercapitalized for the purposes of the Aronson test because "[t]he adequacy of capital is to be measured as of the time of a corporation's formation." Nevertheless, the judge noted that the fact that almost all of the Symons companies were undercapitalized as of 1999 "cannot be ignored."

29.   One can understand a court attempting to wriggle free of an arbitrary freezing of an undercapitalization determination to the time of a company's formation. There are cases which examine undercapitalization as a continuing issue. Steiner Elec. Co. v. Maniscalco, 51 N.E.3d 45, 58 (Ill. App. Ct. 2016); see also Coughlin Const. Co., Inc. v. Nu-Tec Indus., Inc., 755 N.W.2d 867, 876 (N.D. 2008). Indeed the capitalization of a corporation, along with the other assets it has available for conducting its business and paying creditors, may reflect on whether it is being operated in a financially responsible way and worthy of the limited liability privilege. In addition, liability insurance carried by an entity may be especially relevant to the financial responsibility issue where a tort victim is the creditor. Radaszewski v. Telecom Corp., 981 F.2d 305, 309 (8th Cir. 1992).

**QUESTION 13 ATTACHMENT CONTINUED PAGE 15 OF 88**

## INABILITY TO PAY

30.     Based on my research the Debtor Perigrove 1018 is unable to pay for the damages as it does not have sufficient assets. In order to ensure that the petition is not filed, unless necessary, I conducted the BR 9011 prefiling inquiry and the Debtor Perigrove 1018 refused to cooperate.

## HOW THE SCHEME TO FRAUD DESIGNED BY PERIGROVE 1018 WORKED

31.     Billions of dollars have been allocated by the United States during the COVID. An entity owned by Perigrove, Corizon, obtained these funds. They however did not use these funds for the purposes intended.

32.     They gave their management bonuses, but the staff in the prisons got nothing.

33.     The Debtor Perigrove 1018 did this in every prison or jail, they have had contracts in.

34.     Though neither the Debtor Perigrove 1018 nor Corizon has never maintained its principal place of business in Texas, Perigrove decided to restructure in Texas for the explicit purpose of defrauding the United States, creditors and prisoners.

35.     Perigrove hired lawyers to help it perpetrate the fraud and obtained legal advice, unbeknown to these lawyers, for the success of its scheme. United States v Ballard, 779 F.2d 887(5th Cir. 1986) (communication not privileged when used to perpetrate crime.)

36.     Judge Stanley Sporkin in Lincoln Savings & Loan Assn. v. Wall, 743 F.Supp. 901 (DC 1990) wanted to know "where were these professionals ...when these improper transactions were being consummated? Why didn't they speak up?

37.     Attorneys, compliance officers, auditors, all did not follow their professional standards, and looked the other way, thereby aiding Perigrove in its activities.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 16 OF 88

38.     During the period January 2020 through January 2021 Perigrove obtained funds authorized by 12 USC 4703a; 15 USC 636; 15 USC 9001; 15 USC 9009a; 15 USC 9011; 15 USC 9051; 21 USC 21516; 22 USC 4801; 42 USC 234; 42 USC 603; 50 USC 4532; amongst others, for the 25 contracts cancelled and a subject of the Chapter 11.

39.     In the applications to obtain these funds and subsequent reports on how these funds were used, Perigrove made material misrepresentations, that the funds were not used, as represented, but were given as bonuses to executives, and misappropriated by senior staff. Perigrove did not account for these monies.

40.     Perigrove 1018 knowingly intentionally made intentional deliberated decisions to disobey disregard the law. Isaac Lefkowitz , M2 LoanCo; Perigrove,  M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC;  Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC ,   were unaware of all the participants, but were aware of the essential nature and general scope of the conspiracy, which was to engage in the conduct above   , to frustrate  prisoner litigation, and deny me and 300,000 prisoners access to evidence favorable to me and 300,000 prisoners   and inculpatory to themselves, as well as compensation for our injuries caused by Perigrove..

41.     Isaac Lefkowitz;; M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC; Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC,   pursued the object of the conspiracy by performing what their part of the conspiracy was and other agents, employees, subordinates,  performed another part, willfully agreeing to participate with the common design to deprive me and the 300,000 victims of the rights  I complain of in this litigation.

**QUESTION 13 ATTACHMENT CONTINUED PAGE 17 OF 88**

42.     By and through the use of the unlawful means in this complaint, through the overt acts in this complaint, which overt acts were committed in furtherance of the conspiracy discussed above, each of them ensured the conspiracy continues and succeeds, which conspiracy is open ended and continues to this date.

43.     Each of these Perigrove 1018 agents are professionals who under no set of circumstances did not know that the wrongs  I complain of were not unlawful. THEY REFUSED TO SPEAK UP OR DISASSOCIATE THEMSELVES FROM THESE ACTS. It is difficult to understand that with all this professional talent, why one of them would not blow the whistle.

44.     Each individual willfully agreed to become members of the conspiracy agreeing to participate directly/indirectly in the conspiracy. They knew of the conspiracies to deny  me equal protection, equal privileges, had the power to prevent or aid in the prevention of the commission of the conspiracies. They could have with reasonable diligence, but neglected or refused to prevent the conspiracies.

## SOME SPECIFIC ACTS COMMITTED BY CORIZON

45.     After Scott King Corizon General Counsel submitted requests for pandemic related federal funds for all venues that Perigrove was operating under during the period January 2020 through January 2021 Perigrove obtained funds authorized by 12 USC 4703a; 15 USC 636; 15 USC 9001; 15 USC 9009a; 15 USC 9011; 15 USC 9051; 21 USC 21516; 22 USC 4801; 42 USC 234; 42 USC 603; 50 USC 4532; amongst others, for the 25 contracts cancelled.

46.     He submitted reports with false declarations that the funds were used to pay employees.

47.     Isaac Lefkowitz;; M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC; Valitas Intermediate Holdings Inc; Valitas Health Services, Inc;

## QUESTION 13 ATTACHMENT CONTINUED PAGE 18 OF 88

Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC,    sent emails to all management staff upon approval of Sara Tirschwell directing them, to have employees work at least 16 hours daily, and if they did work, they should not be paid overtime, and the Managers shall get bonuses.

48.    The emails also informed managers not to have inmates go to hospital, see specialists, and if they die, so be it.

49.    The Managers implemented the emails and received bonuses.

50.    In furtherance of the scheme Sara Tirschwell,  Isaac Lefkowitz ; ;M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC;   Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC ,  all through mail and emails determined that Corizon reorganize in Texas.

51.    Sara Tirschwell,   Isaac Lefkowitz ; ;M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC;   Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC ,   agreed to form Tetum Care Services Inc aka Corizon a Texas Corporation; YesCare Corporation, a Texas Corporation and CHS Tex, a Texas Corporation. Never has Perigrove maintained its place of business in Texas. It has always maintained its principal place of business in New York.

52.    Sara Tirschwell,   Isaac Lefkowitz ; ;M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC;   Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC ,   agreed to transfer bulk of the assets of Corizon  to CHS TEX, liabilities to YesCare and bonds and policies to Tehum. This reorganization was a sham designed to defraud.

53.    Perigrove then as planned filed for bankruptcy.

**QUESTION 13 ATTACHMENT CONTINUED PAGE 19 OF 88**

54.    The Ankura consulting was hired to conduct due diligence. Russell Perry of Ankura did not examine the financials as he should have, especially the use of COVID funds, and any claims against Corizon for spoliation of evidence.

55.    Sara Tirschwell,    Isaac Lefkowitz ;  ;M2 LoanCo; Perigrove, M2 HoldCo, LLC; M2 LoanCo LLC; M2 EquityCo LLC;    Valitas Intermediate Holdings Inc; Valitas Health Services, Inc; Corizon Health Inc; Corizon LLC; Corizon Health of New Jersey LLC ,   loans from monies laundered from the assets of Corizon. These were sham loans.

56.    March 6, 2020 Nichole Cullen sent emails from qpwblaw.com to Babich and Perkins at cch.com with copies to Gottfried and Carter directing them not to show me emails hat they send or receive. Copies were sent to bowwlaw.com Orm@teamcenturion and cch.com

57.    November 25, 2018 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

58.    May 6, 2018 Dr. Ayodeji Ladele sent emails to all staff directed not to prescribe inmates medication that is cost prohibitive or not to refer inmates for consultation.

59.    May 6, 2018 Dr. Ayodeji Ladele sent emails to all staff that they must change patient records in order to comply with Parsons. Conlon prepared declarations that contradicted these emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

60.    March 20, 2018 Robert Maldonado from cch.com sent emails that Corizon had altered the records required to be filed by Parsons.

61.    March 20, 2018 Marlene Bedoya from azadc.gov sent emails that records had been altered by Corizon. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

**QUESTION 13 ATTACHMENT CONTINUED PAGE 20 OF 88**

62.     December 2017 Dr. Fallhouse sent an email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

63.     November 2017 Dr. David Robertson sent emails to Dr. Fallhouse that Corizon was altering reports and must stop. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

64.     November 2017 Spencer Sego sent Corizon an email that he had changed the reports that Parson requires to comply with Parsons.

65.     October 2017 Dr. Fallhouse sent an email to Corizon corporate that he had delivered the altered reports pursuant to Parsons the ADCRR as directed by Corizon corporate.

66.     April 21, 2017 Dr. Michael Minev sent email to  Dr. Rodney Stewart cch.com   that he has changed the medical records to comply with  the report submitted pursuant to Parsons, as requested

67.     April 2017 FHA Porter sent altered reports required by Parsons to ADCRR and notified Corizon corporate.

68.     March 21, 2016 Dr. Rodney Stewart cch.com sent emails to all staff that they must make sure that the records when submitted pursuant to Parsons, are reconciled with the medical records, and if necessary the medical records changed.

69.     August 28, 2014 Dr. Winfred Williams from ch.com sent emails to staff to ensure that staff change the records to coincide with the reports submitted under Parsons... Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

70.     March 4, 2014 Joseph Scott Conlon rcdmlaw. Com sent email to Dr. Dimitic Catsaros ch.com asking him to sign an affidavit that contradicted the emails sent by Catsaros when he was with Wexford health July 16,2012 where he was directed by Wexford change my treatment due to the cost. Catsaros executed the affidavit. These emails were

**QUESTION 13 ATTACHMENT CONTINUED PAGE 21 OF 88**

subsequently sent to Gottfried azag.gov and Struck swfirm.com

71.     September 2, 2013 Dr. Lucy Burciaga sent an email to staff to ensure that staff change the records to coincide with the reports submitted under Parsons... Conlon prepared a declaration contradicting the emails. These emails were subsequently sent to Gottfried azag.gov and Struck swfirm.com

72.     August 3, 2013 Dr. Kevin Lewis sent email to Dr. Joseph Moyse which directed him not to prescribe inmates medication that is cost prohibitive and if inmates die, Corizon will take care of it.

73.     June 26, 2013 NP Unger received an email that directed him not to provide inmates with care that is expensive and not to refer inmates to specialists.

## PERIGROVE 1018 PLACED MR. LEFKOWITZ IN CHARGE TO ENSURE SUCCESS OF ITS SCHEME

74.     At Isaac Lefkowitz's Direction, Corizon Sent $3 Million to Perigrove 1018 Related Party Geneva Consulting.

75.     Perigrove 1018 placed Mr. Lefkowitz in charge of the entities it had acquired and planned to move forward with the company's business.

76.     Mr. Lefkowitz's first actions at Corizon included directing Corizon's immediate parent (Valitás Health, Inc.) accountants to enter into a Consulting Agreement with related entity Geneva Consulting, LLC ("Geneva") and directing Corizon's accountants to transfer $3 million to Geneva. Geneva shares common directors with Perigrove 1018 and Geneva is owned, directly or indirectly, by Perigrove 1018 and its principals.

77.     Mr. Lefkowitz described the role of Geneva in e-mails to at least one Corizon executive as relating to ongoing litigation claims.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 22 OF 88

## EXECUTIVE TERMINATED FOR QUESTIONING MISAPPLICATION OF FUNDS

78.   Mr. Lefkowitz subsequently terminated a Corizon executive's employment because he questioned misapplication of funds by Lefkowitz and the Debtor Perigrove 1018.

## PERIGROVE 1018, ITS DIRECTORS AND RELATED PARTIES   TRANSFER MILLIONS

79.   Isaac Lefkowitz Causes Transfers of Funds from Corizon Operating Accounts to M2 LoanCo, Perigrove, and Other Related Parties.

80.   When Perigrove 1018 acquired the Corizon entities, Corizon's cash management system was maintained with Bank of America ("BOA").

81.   Soon after the acquisition, Perigrove 1018 opened two new accounts in the name of Corizon Inc. and its subsidiary Corizon, LLC at Signature Bank (the "Signature Accounts").

## PERIGROVE 1018, ITS DIRECTORS AND RELATED PARTIES   OPEN BANK ACCOUNTS IN NAME OF CORIZON BUT CORIZON EMPLOYEES HAD NO ACCESS TO THESE ACCOUNTS

82.   While the Signature Accounts were titled in the name of Corizon, Perigrove made certain that Corizon's accounting staff and executives could not access or view the activity occurring within the Signature Accounts.

83.   Only certain representatives of Perigrove 1018 could access the Signature Accounts.

84.   Periodically, Mr. Lefkowitz would direct Corizon's accounting department to transfer large sums of money from Corizon's operating account at BOA to these Signature Accounts and other Perigrove ventures.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 23 OF 88

## PERIGROVE 1018 WAS RESPONSIBLE FOR MOVING MONIES

85.     Mr. Lefkowitz on behalf of Perigrove was responsible for making the final decisions, and the company's accounting staff sought his express approval before making any distributions from the BOA accounts.

## PERIGROVE USED CONDUITS TO TRANSFER MONIES

86.     Once Perigrove ordered Corizon transfer funds from its BOA accounts to the Signature Accounts, those funds were immediately transferred out of the Signature Accounts to separate accounts by Perigrove belonging to M2 LoanCo. In addition to these transfers out of the Signature Accounts, Perigrove 1018 representatives sometimes caused funds to be transferred funds into Signature Accounts, then transferred those same funds to Corizon's BOA account to fund company expenses.  Additionally, on a handful of occasions, Perigrove 1018 representatives caused funds to be transferred out the Signature Accounts and subsequently caused the same amounts to be transferred back into the Signature Accounts.

87.     Isaac Lefkowitz on behalf of Perigrove Causes Corizon to redirect $1.1 Million in Receivables and Pays an Additional $2.5 Million to Geneva. During the same time period, Perigrove kept, Corizon entities occasionally received or were entitled to payments outside the ordinary course of business, such as partial refunds of prepayments, negotiated agreements to sell off existing inventory, or settlement of disputes.

## CORIZON FUNDS ARE USED TO BENEFIT PHARMACORR.

88.     Perigrove 1018's December 2021 acquisition included PharmaCorr, LLC and its parent companies.  By the time these entities were included in the Perigrove 1018 acquisition, PharmaCorr was no longer a Corizon subsidiary.  However, in

## QUESTION 13 ATTACHMENT CONTINUED PAGE 24 OF 88

January and February 2022, Corizon funds were used to pay approximately $956,700 to Amerisource Bergen.

## TRANSFERS TO M2 LOANCO

89.　At all relevant times, M2 LoanCo had two directors—Isaac Lefkowitz and Alan Rubenstein.　M2 LoanCo never had employees and did not maintain e-mail records on its own server.

12/29/2021 $10,000,000.00
12/30/2021 $5,000,000.00
1/4/2022 $2,300,000.00
1/5/2022 $600,000.00
1/31/2022 $5,000,000.00
2/18/2022 $600,000.00
3/8/2022 $10,000,000.00
3/9/2022 ($10,000,000.00)
5/17/2022 $1,000,000.00
11/14/2022 $25,572.19
11/14/2022 $12,583.00
Total to M2 LoanCo $24,538,155.19

## TRANSFERS TO GENEVA CONSULTING

90.　Within days of Perigrove 1018's acquisition of the Debtor Perigrove 1018 from the Perigrove in early December 2021, Perigrove 1018 appointed one of its directors, Isaac Lefkowitz, as the decision-maker for all of the companies.　Mr. Lefkowitz, in turn, caused the Debtor Perigrove 1018 to enter into a "Consulting Agreement" with Geneva. The "Consulting Agreement" is between Valitás Health Services, Inc. and Geneva Consulting, LLC. Mr. Lefkowitz signed the Consulting Agreement as the "Interim CEO" for Valitás.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 25 OF 88

91.     A director listed on Perigrove's website signed the Consulting Agreement as "Director" of Geneva.  Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then-CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement.

92.     On December 8, 2021, the Corizon transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement.

93.     Corizon then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement.

94.     A director listed on Perigrove's website signed the Consulting Agreement as "Director" of Geneva.  Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then-CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement.

95.     On December 8, 2021, the Corizon transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement.

96.     Corizon then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement.

97.     A director listed on Perigrove's website signed the Consulting Agreement as "Director" of Geneva.  Mr. Lefkowitz directed James Hyman, the then-CEO of Corizon Health, Inc., and Jeff Sholey, the then-CFO of Corizon Health, Inc., to transfer substantial sums to Geneva under the Consulting Agreement.

98.     On December 8, 2021, the Corizon transferred $3 million to Geneva, purportedly as a retainer required under the Consulting Agreement.

**QUESTION 13 ATTACHMENT CONTINUED PAGE 26 OF 88**

99.    Corizon then transferred $500,000 per month for the subsequent five (5) months, purportedly for "Corporate Restructuring" services under the Consulting Agreement.

## TRANSFERS TO AMERISOURCE BERGEN TO BENEFIT PHARMACORR AND PERIGROVE 1018 RELATED PARTIES

100.    Amerisource Bergen to satisfy obligations of PharmaCorr, which ceased  being a subsidiary of Corizon under the Perigrove's ownership and control:

1/31/2022 $500,000.00
2/15/2022 $456,707.08
Total to Amerisource Bergen $956,707.08

## ACCRUAL AND THE INJURY I SUSTAINED FROM THE CRIMINAL ENTERPRISE OPERATED BY CORIZON AS SET FORTH BELOW

101.    After Corizon notified the Third Circuit of this Bankruptcy, that court in Case 22-1861 on April 13, 2023 abstained as to all Defendants, because the claims in that case, were about spoliation by all Defendants, and the Third Circuit, District Court, Defendants, failed to address the spoliation. In the District of Arizona, after Defendants filed a notice of this bankruptcy, the District Court, as mandated by law, abstained from ruling on the spoliation as to all Defendants for the reasons above. CIV 18-0066RM. After Defendants notified the Ninth Circuit in 21-15902 of these Bankruptcy proceedings, the Ninth Circuit has not ruled on the matter, it appears, the court has abstained.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 27 OF 88

## WHAT THE FORMER MEDICAL DIRECTOR OF CORIZON, HAS TESTIFIED TO

102.    The United States District Court in Arizona has found in Parsons v Ryan that:

103.    "Defendant Shinn is satisfied with a system that presents a substantial risk of serious harm. That is almost a perfect illustration of 'deliberate indifference." (p 111@ 24-26)

104.    Accordingly, it can be assumed that it was clear to Defendant Shinn at the time of the contract renewal that Centurion had significant concerns regarding its performance. (pp 111 @ 8-10)

105.    "The fundamental conclusion is that ADCRR prisoners who develop life threatening medical conditions are at significant risk of serious harm. The ones that do develop such conditions may die prematurely, suffer prolonged pain or die. The risk is applicable to all prisoners because anyone is susceptible to serious injury or illness at any time…no prisoner, at any location, is safe." (pp 122 @ 14-20)

106.    "Defendant Shinn's testimony also made clear he has adopted a strategy of pretending the problems he knows about do not exist." (pp 111@ 17-18)

107.    "Moreover specifically, Centurion apparently realized it would not be able to perform adequately and significant contempt fines were likely. To avoid catastrophic liability, Centurion ensured ADCRR would bear the brunt of nonperformance. Shinn simply agreed to limit Centurion's liability and insulated it from meaningful consequences for its failures" (pp 111 @ 10-16)

108.    "In essence, it is Defendants' position that access to any care, no matter how poor, satisfies their constitutional obligations." (pp 29 @ 2-3))

109.    "The question is whether the policies and procedures create a risk of harm to…prisoners. There is no question they do" (pp 117@21-23)

**QUESTION 13 ATTACHMENT CONTINUED PAGE 28 OF 88**

110.   "Are Defendants violating the constitutional rights of Arizona's prisoners...? The answer is yes..." (pp 1 @ 26 to 2 C3)

111.   Dr. Jordan testified medical schools do not teach the type of healthcare issues prisoners have, which are very bad. (pp 16 @ 21-28)

112.   "In Dr. Wilcox's expert opinion "the poor quality of clinical decision-making demonstrated by nurses and providers in the ADCRR harms patients and places them at an unreasonable and substantial risk of serious harm." (pp 28 @ 10-14

113.   "The current staffing levels illustrate ADCRR does not have the ability to address the varied and other complex needs of Arizona prisoners" (pp 22 @ 1-2)

114.   "Defendants have failed to provide, and continue to refuse to provide, a constitutionally adequate medical care....Defendants have been aware of their failures for years and Defendants have refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." (pp 2 @ 4-11)

115.   Nursing Encounter Tools referrals by provider to Utilization Management and the responses, etc.  (pp 13@ 12 - 14 @ 18)

116.   "Defendants have failed to provide, and continue to refuse to provide, a constitutionally adequate medical care....Defendants have been aware of their failures for years and Defendants have refused to take necessary actions to remedy the failures. Defendants' years of inaction, despite Court intervention and imposition of monetary sanctions, establish Defendants are acting with deliberate indifference." (pp 2 @ 4-11)

117.   Nursing Encounter Tools referrals by provider to Utilization Management and the responses, etc.  (pp 13@ 12 - 14 @ 18

**QUESTION 13 ATTACHMENT CONTINUED PAGE 29 OF 88**

118.    Dr. Wilcox was asked if he was "aware of any other health care settings where the nurse serves as the final decider when someone seeks to access their doctor." He responded "No." Considering that it's not really legal, you wouldn't expect to find any others. But, you know, can you imagine in the community if you schedule an appointment with your doctor and you're met in the lobby by the nurse who does a little assessment on you and then turns you around and sends you home and you're not allowed to see your doctor? That just doesn't exist in the scope of healthcare anywhere" (pp 28 @ 15-20)

119.    "The majority of medical staff do not have the necessary training or licensure to provide the type of care that is necessary to provide constitutionally adequate care...The patterns of delay and indifference are pervasive." (pp 69@ line 22-26

## THE PRISONER VICTIMS

120.    DeBlasio v. Baldwin Case No1. 3:17-CV-773-NJR United States District Court For The Southern District Of Illinois.   In September 2015, DeBlasio saw a physician's assistant, Travis James, who noted that DeBlasio had right testicle pain, flank pain, and a small amount of blood in his urine. James also noted tenderness on the right flank area .James suspected either epididymitis, which is inflammation of part of the testicle, or a kidney stone.

121.    On September 17, 2015, James saw DeBlasio for a follow-up exam and noted DeBlasio reported significant right flank pain and sharp pain in the inguinal area.  James ordered an x-ray of DeBlasio's abdomen and the pain medication Toradol

---

[1] These are only some of the victims. There are too many victims and Corizon has the details.

## QUESTION 13 ATTACHMENT CONTINUED PAGE 30 OF 88

122.    On September 21, 2015, James reviewed the results of the x-ray with DeBlasio and charted "noticed issue w/vertebrae." James looked at the x-ray for kidney stones, but did not see any. When James looked higher on the x-ray, James told him to sit down and asked if he had been injured because there was a problem with his vertebrae. DeBlasio could not recall any injuries to his back. James ordered Motrin 800 mg, a back support, a low bunk and low gallery permit, and a follow-up in two weeks.

123.    James is not an x-ray technician, however, and he did not diagnose DeBlasio with a fracture in his vertebrae. On October 5, 2015, Dr. John Coe, the Medical Director at Lawrence, examined DeBlasio for his complaints of testicular and abdominal pain. His blood pressure at this visit was 140/90

124.    Dr. Coe examined DeBlasio's back and hips, noting that upon movement his right hip had some limitations and pain. He also examined DeBlasio's testicles and noted that his prostate was tender and swollen. Dr. Coe diagnosed DeBlasio with epididymitis, or inflammation of part of the testicle, which can cause pain in the lower abdomen/pelvic region, pain and tenderness in the testicles, and issues with urination. Because it can be caused by an infection, Dr. Coe ordered 15 days of the antibiotic Cipro in addition to Tylenol and Bisacodyl, a laxative. He also ordered an x-ray of DeBlasio's right hip and lumbar spine, as well as a follow-up appointment after the x-ray.

125.    On October 14, 2015, Dr. Coe saw DeBlasio to follow up on the lumbar x-ray. The x-ray showed only mild degenerative disease. Dr. Coe noted that DeBlasio moved well and was able to get up and down from the table without difficulty. Dr. Coe also performed neurological testing, which revealed no deficits. Dr. Coe further noted that DeBlasio was not wearing his back support. Because mild degeneration is not uncommon and does not require medical intervention, and based on the

**QUESTION 13 ATTACHMENT CONTINUED PAGE 31 OF 88**

normal findings from the examination, Dr. Coe found that additional treatment was not required for DeBlasio's low back and hip complaints.

126.    Dr. Coe also examined DeBlasio's testicles and found that the epididymis was no longer swollen. He did note, however, a tender, three-millimeter knot on DeBlasio's testicles, as well as tenderness near an old appendectomy scar. Dr. Coe ordered that DeBlasio remain on the same medication and be scheduled for a follow-up appointment.

127.    On October 23, 2015, DeBlasio went to nurse sick call with complaints of abdominal, back, and testicular pain. His blood pressure was 168/98. Dr. Coe was contacted and ordered that DeBlasio receive Toradol, a pain and anti-inflammatory medication. Dr. Coe examined DeBlasio on October 26, 2015, noting that bowel sounds were present but not very active and that his abdomen was tender near his gallbladder. DeBlasio's blood pressure on this date was 133/100. Dr. Coe suspected possible gallstones and requested a gallbladder ultrasound through the Collegial Review process.

128.    Collegial Review is a Wexford process by which a case is presented to other physicians to determine what an appropriate treatment plan is for the patient, including whether imagining, specialty evaluation, or testing should be performed. The gallbladder ultrasound was approved and performed on October 28, 2015. The results were normal.

129.    Dr. Coe next saw DeBlasio on November 12, 2015. In addition to discussing the normal ultrasound results, Dr. Coe examined DeBlasio and noted a weakened area near his old appendectomy scar, as well as a weakened internal right inguinal ring that was tender and bulged when DeBlasio coughed. Dr. Coe attested that he thought DeBlasio may have early signs of a hernia. He also considered whether DeBlasio may have internal scar tissue from his previous appendectomy that could be causing abdominal discomfort. Because either condition can cause discomfort with constipation, Dr. Coe

**QUESTION 13 ATTACHMENT CONTINUED PAGE 32 OF 88**

ordered Fiberlax, Colace (a stool softener), and Milk of Magnesia (a laxative and antacid). He also ordered a urinalysis test. DeBlasio's blood pressure was 146/90 at this visit.

130.    The urinalysis came back positive for blood, so Dr. Coe ordered another urinalysis that could be sent away for additional testing. Dr. Coe saw DeBlasio on November 20, 2015, and again noted pain and tenderness near the inguinal area and appendectomy scar. His blood pressure was 155/101. Dr. Coe submitted his case to Collegial Review to determine an appropriate treatment plan, and on November 24, 2015, DeBlasio was approved to see an outside urologist.

131.    Before he could see the urologist, on November 30, 2015, DeBlasio reported to the Healthcare Unit with dizziness, lightheadedness, and a small amount of blood in his spit. DeBlasio was sent to Lawrence County Memorial Hospital for evaluation, but a chest and abdomen x-ray came back unremarkable. DeBlasio received an IV infusion of Vasotec, a medication that can be used to lower blood pressure. Dr. Andrew West at Lawrence Hospital diagnosed DeBlasio with Irritable Bowel Syndrome (IBS), history of blood in vomit, and right inguinal pain, but he ruled out a right inguinal hernia. Dr. West wrote a prescription for Alosetron, which can be used to treat IBS, and Librium, an anti-anxiety medication. Dr. Coe attested that IBS is not a serious medical condition and can be controlled with an appropriate diet, exercise, stress management, sleep, and medication.

132.    DeBlasio was seen by the urologist, Dr. Gary Reagan, on December 24, 2015. Dr. Reagan recommended a cystoscopy, which is a scope of the bladder through the urethra. Dr. Coe submitted the cystoscopy recommendation to Collegial Review; it was approved on January 5, 2016, and performed on February 9, 2016. The cystoscopy did not reveal any structures, tumors, lesions, or stones that could account for the blood in DeBlasio's urine. Furthermore, although Dr. Reagan

**QUESTION 13 ATTACHMENT CONTINUED PAGE 33 OF 88**

found DeBlasio had an enlarged external ring, there was no distinct hernia. Dr. Reagan suggested that DeBlasio only follow up as needed, as routine follow up was not necessary. Dr. Coe saw DeBlasio on February 11, 2016, as follow up after his procedure, and ordered additional Toradol and Motrin. DeBlasio's blood pressure on this date was 150/104.

133.    On February 23, 2016, DeBlasio returned to Dr. Coe for reexamination at the request of the Warden. DeBlasio complained of pain in his right groin, right pelvis, and right scrotum, where he reported increased swelling. Dr. Coe noted mild tenderness in DeBlasio's right testicle and near his appendectomy scar. He also noted that DeBlasio's right internal ring was tender with roughing and a bulge. Dr. Coe further examined DeBlasio's prostate and rectum, noting no lesions, no external hemorrhoids, no masses, and no stool present. He diagnosed DeBlasio with adhesion pain from his appendectomy, pre-hernia pain, mild and recurrent epididymitis, and a history suggestive of symptom magnification. Dr. Coe ordered antibiotics and scheduled a follow up for 10 days.

134.    On February 25, 2016, Dr. Coe noted that DeBlasio's blood pressure had been high since October 2015. Dr. Coe ordered that his blood pressure be checked at the next appointment, after the round of antibiotics was over, and to start him on a prescription medication if appropriate. Dr. Coe attested that one's blood pressure can fluctuate, and medication is not immediately required due to high readings. He further attested that blood pressure should be monitored over time and non-medication approaches can be taken to lower high blood pressure.

135.    On March 4, 2016, Dr. Coe examined DeBlasio as a follow up to his February 25 visit. He noted that DeBlasio continued to have pain but did not have a hernia, his testicles were normal and symmetric, and his blood pressure was normal at 118/85. On March 23, 2016, DeBlasio reported to the

**QUESTION 13 ATTACHMENT CONTINUED PAGE 34 OF 88**

Healthcare Unit for nausea and vomiting. His abdominal examination was normal, he showed no signs of guarding, tenderness, or distention, and his blood pressure was normal at 128/82. On April 1, 2016, Dr. Coe saw DeBlasio and examined his abdomen and groin, noting no abnormalities. Dr. Coe ordered Pepcid, Tums, Colace, and Fiberlax to treat DeBlasio's abdominal discomfort (Id.).

136.    Dr. Coe again saw DeBlasio on April 21, 2016, to address DeBlasio's concern that he had a left side groin hernia. Dr. Coe found no left-sided hernia, not even a bulge. Dr. Coe went over DeBlasio's prior x-ray and further educated DeBlasio on his right-side pre-hernia that only slightly bulged when he coughed

137.    On May 24, 2016, DeBlasio saw Nurse James regarding an H Pylori (stomach bacteria that can cause abdominal discomfort) test that was negative. DeBlasio reported that he had abdominal pain that got worse when his stomach was full after eating. James noted that DeBlasio has had multiple tests done for his abdominal complaints with no real findings and determined DeBlasio may have anxiety or possible IBS.

138.    Dr. Coe saw DeBlasio for the last time on July 7, 2016. He noted some tenderness in DeBlasio's abdomen but did not find any new or worsening symptoms from his previous diagnoses. He found that DeBlasio had chronic abdominal pain and ordered that DeBlasio remain on the same medications.

139.    On August 26, 2016, DeBlasio was seen by another medical professional at Lawrence who prescribed him Toprol-XL, which can be used to treat hypertension. Dr. Coe attested that throughout his time at Lawrence, DeBlasio never experienced a cardiac or vascular event associated with high blood pressure. Furthermore, DeBlasio never informed Dr. Coe of any adverse symptoms related to high blood pressure.

140.    Consistent with Dr. Coe's findings, the numerous subsequent tests and imaging have failed to identify any medical cause of DeBlasio's subjective complaints. On August

**QUESTION 13 ATTACHMENT CONTINUED PAGE 35 OF 88**

26, 2016, an abdominal ultrasound suggested DeBlasio was constipated. An October 21, 2016 abdominal ultrasound was Normal.   A May 9, 2017 kidney ultrasound was normal.   A May 23, 2017 abdominal ultrasound indicated DeBlasio had chronic constipation (. A November 4, 2017 colonoscopy revealed no polyps or other diagnosable condition .Finally, a December 20, 2017 chest x-ray revealed no abnormality or active pulmonary disease and showed his bones were intact.

141.   Harper v. Ryan No. CV 18-00298-PHX-DGC (CDB) United States District Court for the District of Arizona Harper is terminally ill with cancer, and he alleged that Ryan set up and implemented policies that limit or deny treatment for terminally ill prisoners. Harper alleged that Corizon failed to comply with orders from the treating specialist, including orders for follow-up treatment and prescribed medications. Harper also alleged that Corizon failed to provide medication and treatment for pain, fever, and complications related to his catheter. According to Harper, Health Care Providers failed to provide post-surgery follow-up treatment, treatment for an infection surrounding his suprapubic catheter, pain management treatment related to his cancer, and denied requests to send him to an oncologist.

142.   In 2007, Harper was diagnosed with Hodgkin's lymphoma, and he had recurrences in 2011 and 2014. His last oncology appointment was in 2014 with Dr. John Kelly in Tahoe, Nevada. Harper also suffers from idiopathic neurogenic bladder, testicular epididymitis (inflammation), and thyroid disorder, among other conditions.

143.   Harper entered the custody of the ADC in March 2017. On March 31, 2017, while at the Phoenix Alhambra Reception facility, Harper saw Dr. Sheldon Epstein for a physical. At this appointment, Harper was listed as 5 feet 11 inches tall and weighing 158 pounds. As to Harper's medical history, Dr. Epstein noted Hodgkin's lymphoma, remission. 2014; bone marrow and left cervical node biopsies; radiation and

**QUESTION 13 ATTACHMENT CONTINUED PAGE 36 OF 88**

chemotherapy 2007-2014; bedtime nausea; and chronic arthralgias (joint pain). (Id.) Dr. Epstein assessed the following: malignant neoplasm (growth of tissue); thyrotoxicosis (excess thyroid hormone), chronic pain syndrome, calculus of kidney (kidney stone), tachycardia, and nausea.

144.    Dr. Epstein ordered Meclizine (for nausea), Meloxicam (for chronic pain syndrome), and Propranolol (for Tachycardia).   Dr. Epstein also issued Special Needs Orders (SNOs) for Harper to be given a lower bunk, catheter supplies, and daily showers.  In the "Plan Notes" section of the medical record, Dr. Epstein wrote that Harper needs an endocrine appointment.

145.    On April 4, 2017, Harper saw Nurse Practitioner (NP) Denehy.  Denehy noted that Harper had a history of an idiopathic neurogenic bladder and had an indwelling (inside the body) catheter up until three weeks before.   Harper had been removing the catheter himself but could no longer advance the catheter past what Harper described as a bladder sphincter.   Denehy contacted Dr. Malachinski, who recommended inserting a Foley urinary catheter and doing a urine culture lab test. Physician Assistant (PA) Spizzirri attempted to insert the Foley catheter, but was unable to pass the catheter into the bladder in two attempts.

146.    NP Denehy then got approval to send Harper to the hospital emergency room for insertion of an  indwelling Foley. The next day, Harper saw Dr. Izabela Musial for a follow up to the hospital visit. The medical records document that "Hospital discharge instructions reviewed and acted upon with additional changes see plan," but the hospital discharge records were not submitted to the Court. Harper reported blood in his urine, a 30-pound weight loss in the last three months, and loss of appetite, anxiety, and sweating. In the "Assessment Notes," Dr. Musial wrote that Harper had "neurogenic bladder with difficult self-catheterizations;

**QUESTION 13 ATTACHMENT CONTINUED PAGE 37 OF 88**

nephrolithiasis [kidney stone] needs eval[uation]; Hodgkin['s] lymphoma needs eval; Hyperthyroidism not well controlled, needs labs and endocrinology input."   Dr. Musial started Harper on Ibuprofen and Oxybutynin as recommended by the emergency room and she documented that Harper needs referrals to urology and endocrinology. A nurses' order was issued to get Harper's past medical records, and Dr. Musial also wrote "Please make sure that whatever yard [Harper] is transferred to that they order ASAP Urology consult . . . Endocrinology for controlling hypothyroidism possible Iodine radiation . . . Oncology to eval[uate] Hodgkin's lymphoma."

147.    On April 11, 2017, Harper was transferred from Phoenix Alhambra Reception to the Florence South Unit, and on April 20, 2017, he saw NP Udoko for follow up. NP Udoko documented that Harper needed follow up for thyroid enlargement and abnormal levels, that Harper was developing new lymph nodes behind his left ear, that self-catheterization had become difficult because the sphincter was closed, and that Harper was concerned about testicular epididymitis.   In the "Plan Notes," NP Udoko wrote "Nephrolithiasis -nephology consult request" and "Hodgkin's lymph[o]ma - oncology consult request."

148.    On May 3, 2017, Harper saw NP Udoko again for a chronic care visit to address Hodgkin's lymphoma and thyroid disorder. Harper reported that his Hodgkin lymphoma was in remission but he had developed 2 nodes behind his ear. Harper reported weight loss (8 pounds in 10 days), night sweats, poor appetite, and nausea—for which he had medication that was helping. Harper also reported that he was taking medication for his thyroid, but he was tired all the time, he could not work, and he could not take Ditropan (bladder relaxant) for his bladder situation because it caused blindness, and he requested non-duty status. In the "Objective Notes," Udoko noted "left mastoid - nodular tissue with swelling" and "enlarged nodes - cervical left greater than right with

**QUESTION 13 ATTACHMENT CONTINUED PAGE 38 OF 88**

tenderness on palpation." Udoko requested an oncology consult.

149.     On June 26, 2017, Harper went to the Arizona Oncology Network for an oncology appointment with Dr. Sanueev Gopal. Harper reported to Dr. Gopal that his Hodgkin's lymphoma had been in remission since 2014, but he began having symptoms three months ago and had lost 45 pounds in the last 6 months.  Dr. Gopal conducted a thorough exam and noted symptoms that included fatigue, nausea, vomiting, anorexia, headaches, new mastoid nodules and swollen lymph nodes in the left neck.    Dr. Gopal assessed Harper's history of Hodgkin's lymphoma and ordered a PET/CT for evaluation and staging; labs, including a complete blood count; and copies of Harper's past treatment and chemo-radiation records from the Nevada medical center.    Dr. Gopal wrote that if a reoccurrence is confirmed, Harper will need a radiation oncology consult.

150.     Dr. Gopal recommended "maximizing nutrition, due to weight loss."  Lastly, Dr. Gopal ordered follow-up in 2 weeks "or as soon as possible with labs and PET/CT results." On July 2, 2017, Harper submitted a Health Needs Request (HNR) asking to see a provider due to weight loss and swollen lymph nodes. On July 5, 2017, Harper saw NP Udoko for a follow up from the off-site oncology appointment.  NP Udoko noted the recommendations for an urgent PET/CT, labs tests, and a referral to radiation/oncology. NP Udoko also documented Harper's reports of sharp, shooting pain from the left side of his neck radiating up the base of the skull. (Id.) Udoko ordered Codeine for the Hodgkin's lymphoma, lab tests, and a chest x-ray, and he submitted a consult request for radiology.

151.     On July 11, 2017, Harper's catheter fell out, and the nurse on duty was unable to replace it. Harper was taken to the emergency room at Mercy Gilbert Medical Center. The next day, Harper returned from Mercy Gilbert after placement of a Foley catheter, and he denied any pain or discomfort. That

**QUESTION 13 ATTACHMENT CONTINUED PAGE 39 OF 88**

same day, NP Udoko submitted a consult request for radiology PET/CT scan, priority "urgent," in light of the diagnosis of Hodgkin's lymphoma and the June 26, 2017 consult report from Dr. Gopal.

152.   On July 18, 2017, Harper saw Nurse Owiti for complaints of pain in the shaft of his penis and testicles, although he denied burning or irritation, blood in urine, or discharge. The Plan Notes stated "will continue to monitor." Also on July 18, 2017, Corizon Utilization Management documented that the urgent request for a PET/CT scan, which NP Udoko submitted on July 12, was denied in lieu of "Alternative Treatment Recommended."

153.   On July 25, 2017, Harper saw Dr. Rodney Stewart. Harper reported severe testicle and penile pain for 3-4 days and green-colored drainage from the tip of his penis, and he expressed concern about weight loss and painful neck lymph nodes. A urinalysis dip indicated a urinary tract infection (UTI). Dr. Stewart assessed urethritis/epididymitis and "Hodgkin's Lymphoma; patient needs to follow up with oncology and obtain previously requested studies." Dr. Stewart prescribed Codeine/APAP (Tylenol 3) and antibiotics.

154.   On August 2, 2017, an Incident Command System was called for a medical emergency after Harper tripped and his Foley catheter was pulled out. The responding nurse noted that Harper's penis was red around the urethra, and there was brown/red urine in the leg bag. Unsuccessful attempts were made at inserting two different catheters, and Harper suffered severe pain.   Harper was sent to Banner Baywood Hospital for catheter insertion. Harper returned from the hospital that same day with a new Foley catheter secured with stat-lack, a special taping system.   The nurse documented in the medical record that a call was made to Dr. Johnson and a message was left to inform him of Harper's return and that the hospital recommended antibiotics.

**QUESTION 13 ATTACHMENT CONTINUED PAGE 40 OF 88**

155.    On August 6, 2017, Harper was seen by Nurse Jessica Dixon after he submitted an HNR stating he was in massive pain in his lymph nodes and testicles and that he was still not on pain medications and antibiotics. Dixon noted in the record that the hospital had ordered Macrobid 100 mg (an antibiotic). Harper reported that his pain medication—Tylenol 3—ran out and he was still in a lot of pain and that he went to the nurse line on August 3, 2017, but nothing was done for him and he was told return on August 6.

156.    Nurse Grafton issued an order for Ibuprofen for 60 days. On August 8, 2017, Harper saw Dr. Johnson for follow up regarding the Alternative Treatment Plan in place of the PET scan that had been requested twice. Dr. Johnson wrote in the record that Harper asked for Gabapentin or Tramadol, but he told Harper that neither were indicated for lymphoma or chronic pain, so he offered non-steroidal anti-inflammatory drugs (NSAIDS) instead, and Harper walked out of the exam room. Harper asserts that he never asked for Gabapentin or Tramadol at this encounter, but instead requested a renewal of Tylenol 3.  He asserts that Dr. Johnson became belligerent, at which point Harper walked out and filed an Inmate Grievance to the Medical Director about the incident.

157.    On August 10, 2017, Harper saw Dr. Ngwube for a chronic care appointment to address Hodgkin's lymphoma. Dr. Ngwube documented Harper's reports of weight loss and neck pain and history of Hodgkin's lymphoma.   At this time, Harper—at 5 feet 11 inches tall—weighed 127 pounds. Dr. Ngwube assessed emaciation and wrote "will determine if go straight to PET/CT with the [amount] of clinical findings we have thus far from both [patient] and past." Dr. Ngwube also wrote that, for Harper's hyperthyroidism, "will get USG [ultrasound] the neck for further eval[uation] of the thyroid," and that the ultrasound "may help us with possible other masses in the neck." Dr. Ngwube ordered prescriptions for Ibuprofen and Tylenol.

**QUESTION 13 ATTACHMENT CONTINUED PAGE 41 OF 88**

158.    On September 3, 2017, Harper filed two HNRs stating that he had a urinary tract infection and pain, and that his Foley catheter was overdue to be changed. That same day, Harper was seen in medical by Nurse Jacob Bromberg, who noted that Harper was presenting after 30 days with the same Foley catheter from the August 2, 2017 emergency room visit. Bromberg noted the onset of a urinary tract infection with cloudy and odorous urine and complaints of testicular pain.  A urinalysis was positive for a UTI.  Bromberg documented that Harper was "educated on why medical on site could not change Foley [due to] troubles with reinsertion[,]" and that the provider was contacted and orders were given for antibiotics.

159.    Medical records reflect that on September 9, 2017, Harper reported to Nurse David Rodriguez that it was time to replace his Foley catheter. The medical note documents that "due to reported [history], and 10 Foley catheter intact, will refer to provider." Medical records reflect that on September 15, 2017, Harper saw Nurse Nicole Schaffer for a Foley catheter change. The medical note documents that the Foley catheter was changed and the procedure was tolerated well by the patient. On September 20, 2017, Harper had an offsite urology appointment with Dr. Galaxy P. Shah, who performed a cystoscopy (an endoscopy of the urethra and bladder) and an "open SPT placement," which involves inserting a suprapubic tube/catheter into the bladder through the lower abdomen.

160.    On September 22, 2017, NP Gay submitted a routine urology consult request. On September 26, 2017, Harper had a radiology off site appointment for a PET/CT scan.  On October 2, 2017, Harper saw NP Gay, who noted that the suggested labs and PET/CT scan were completed, and they were awaiting records.  NP Gay documented that Harper had lower quadrant discomfort without vomiting and a 45-pound weight loss. The medical record for this date shows that the routine urology consult request submitted on September 22 was cancelled.   There is no documentation of the reason for

**QUESTION 13 ATTACHMENT CONTINUED PAGE 42 OF 88**

the cancellation. Gay documented in the "Plan Notes" her assessment of "Non Hodgkin's lymphoma, possible remission Idiopathic neurogenic bladder and that suggested cystoscopy with supra pubic cath consultation sent.    Pain management; will consider naproxen as needed for now."

161.    Health Care Providers assert that on October 4, 2017, NP Gay put in an order for Morphine Sulfate pain medication. But the medical record they cite for support shows that the Morphine Sulfate order was discontinued by NP Gay that same day.    Similarly, Health Care Providers assert that on October 9, 2017, a prescription for Ciprofloxacin HCL (an antibiotic) was added pursuant to a verbal order from NP Gay, but the medical record shows that the prescription was discontinued.

162.    On October 18, 2017, medical staff changed the Foley catheter. NP Gay documented that Harper had a pending urology procedure and that she reviewed the CAT scan results with Harper. 10 Health Care Providers did not submit any CAT scan results. On October 23, 2017, Harper saw NP Gay for a chronic care visit, and she documented that his labs were within normal limits and his PET scan showed no lymphadenopathy (diseased or abnormal lymph nodes) of the chest, neck, abdomen or pelvis. NP Gay documented Harper's abnormal weight loss of 35 pounds over the last 6 months, and she documented a plan of care to add Naproxen for pain, drink three cans of Ensure a day, weekly weight checks, and labs every 90 days. The medication Oxybutynin (a bladder relaxant) was discontinued on this date.

163.    On October 30, 2017, Harper saw Dr. Glen Babich to discuss the PET scan results. Dr.Babich informed Harper that the PET scan showed abnormal  spinal imaging, that Harper's cancer was spreading into the bone, and that he needed an immediate consult with oncology. This same date, Dr. Babich documented in a "Consultation Request Action" form that Harper's scan showed "abnormal spinal imaging" and that

**QUESTION 13 ATTACHMENT CONTINUED PAGE 43 OF 88**

Harper "needs to follow up with oncology. Site provider to schedule oncology consult."

164.    On November 8, 2017, Harper was seen in medical due to his Foley catheter slipping and the need to hold it in place. The Foley catheter was changed. On November 12, 2017, Levofloxacin (an antibiotic) was ordered due to a positive urine culture.

165.    On November 16, 2017, Harper saw NP Gay for a possible UTI, and he reported brown urine and discomfort. The plan of care was to stop Levofloxacin; add Nitrofurantoin (an antibiotic), a topical cream, and a sulfide shampoo; and set up a plan for further catheter changes. On November 27, 2017, Harper was taken to Maricopa Integrated Health Services for a suprapubic catheter placement outpatient surgery, which was performed by Dr. Shah.

166.    Dr. Shah prescribed NORCO (acetaminophen and hydrocodone) and Senna tablets (a laxative) following the surgery. Upon his return to the prison, however, Harper was given Tylenol 3 instead, and Docusate (a laxative) was ordered. Harper never received the medication. The post-operative directions instructed Harper to return in 4 weeks for follow up with Dr. Shah, removal of sutures, and the first suprapubic catheter change, and to return every 4 weeks thereafter for suprapubic catheter changes.

167.    On December 4, 2017, Harper was seen for a catheter dressing change and he complained of pain. Nurse Litten noted odor when the bandage was removed and green/yellow pus-like fluid around the incision site.  Dr. Johnson was notified, and Ciprofloxacin (an antibiotic) and Codeine/APAP were added.  On December 14, 2017, Harper saw Nurse Emily Gant for a Foley catheter dressing change. Harper complained of severe abdominal pain, and he reported that the catheter was not draining. Upon removal of the dressing, there was a foul odor and brown-yellow drainage covering the previous dressing and catheter insertion site. The opening of the

**QUESTION 13 ATTACHMENT CONTINUED PAGE 44 OF 88**